# Exhibit A

# Superior Court of the District of Columbia

Received
MAR 16 2021
Legal Department
Pittsburgh, PA

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Rex D Winter

vs

The PNC Financial Services Group, Inc.

Case Number: ______

Date: 3/12/2021

☐ One of the defendants is being sued in their official capacity.

| Name: *(Please Print)* Rex D Winter | Relationship to Lawsuit |
|---|---|
| Firm Name: | ☐ Attorney for Plaintiff<br>☒ Self (Pro Se)<br>☐ Other: ______ |
| Telephone No.: 202-341-9453 — Six digit Unified Bar No.: 988749 | |

TYPE OF CASE: ☐ Non-Jury ☐ 6 Person Jury ☒ 12 Person Jury

Demand: $ Greater than $25,000 Other: ______

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: ______ Judge: ______ Calendar #: ______

Case No.: ______ Judge: ______ Calendar#: ______

NATURE OF SUIT: *(Check One Box Only)*

**A. CONTRACTS**

- ☒ 01 Breach of Contract
- ☐ 02 Breach of Warranty
- ☐ 06 Negotiable Instrument
- ☐ 07 Personal Property
- ☐ 13 Employment Discrimination
- ☐ 15 Special Education Fees

**COLLECTION CASES**

- ☐ 14 Under $25,000 Pltf. Grants Consent
- ☐ 17 OVER $25,000 Pltf. Grants Consent
- ☐ 27 Insurance/Subrogation Over $25,000 Pltf. Grants Consent
- ☐ 07 Insurance/Subrogation Under $25,000 Pltf. Grants Consent
- ☐ 28 Motion to Confirm Arbitration Award (Collection Cases Only)
- ☐ 16 Under $25,000 Consent Denied
- ☐ 18 OVER $25,000 Consent Denied
- ☐ 26 Insurance/Subrogation Over $25,000 Consent Denied
- ☐ 34 Insurance/Subrogation Under $25,000 Consent Denied

**B. PROPERTY TORTS**

- ☐ 01 Automobile
- ☐ 02 Conversion
- ☐ 07 Shoplifting, D.C. Code § 27-102 (a)
- ☐ 03 Destruction of Private Property
- ☐ 04 Property Damage
- ☐ 05 Trespass

**C. PERSONAL TORTS**

- ☐ 01 Abuse of Process
- ☐ 02 Alienation of Affection
- ☐ 03 Assault and Battery
- ☐ 04 Automobile- Personal Injury
- ☐ 05 Deceit (Misrepresentation)
- ☐ 06 False Accusation
- ☐ 07 False Arrest
- ☐ 08 Fraud
- ☐ 10 Invasion of Privacy
- ☐ 11 Libel and Slander
- ☐ 12 Malicious Interference
- ☐ 13 Malicious Prosecution
- ☐ 14 Malpractice Legal
- ☐ 15 Malpractice Medical (Including Wrongful Death)
- ☐ 16 Negligence- (Not Automobile, Not Malpractice)
- ☐ 17 Personal Injury- (Not Automobile, Not Malpractice)
- ☐ 18 Wrongful Death (Not Malpractice)
- ☐ 19 Wrongful Eviction
- ☐ 20 Friendly Suit
- ☐ 21 Asbestos
- ☐ 22 Toxic/Mass Torts
- ☐ 23 Tobacco
- ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE IF USED

# Information Sheet, Continued

**C. OTHERS**

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants (DC Code § 11-941)
- [ ] 10 Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment
- [ ] 17 Merit Personnel Act (OEA) (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability
- [ ] 24 Application to Confirm, Modify, Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

**II.**

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)
- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as Judgment [ D.C. Code § 2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code § 42-3301, et seq.)
- [ ] 21 Petition for Subpoena [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1) (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

**D. REAL PROPERTY**

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)
- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

________________________ Attorney's Signature

________________________ Date



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Received
MAR 16 2021
Legal Department
Pittsburgh, PA

REX D WINTER
Plaintiff

vs.

Case Number ____________________

THE PNC FINANCIAL SERVICES GROUP, INC
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Rex D Winter - Pro Se
Name of Plaintiff's Attorney

*Clerk of the Court*

4713 Dolphin Lane
Address
Alexandria, VA 22308

By ______________________
Deputy Clerk

(202) 341-9453
Telephone

Date ______________________

如需翻译,请打电话 (202) 879-4828 Veuillez appeler au (202) 879-4828 pour une traduction Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시요 የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

REX D WINTER
Demandante

contra

Número de Caso: ____________________

THE PNC FINANCIAL SERVICES GROUP, INC.
Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Rex D Winter – Pro Se
Nombre del abogado del Demandante

*SECRETARIO DEL TRIBUNAL*

4713 Dolphin Lane
Dirección
Alexandria, VA 22304

Por: ____________________
Subsecretario

(202) 341-9453
Teléfono

Fecha ____________________

如需翻译,请打电话 (202) 879-4828 Veuillez appeler au (202) 879-4828 pour une traduction Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면,(202) 879-4828 로 전화주십시요 የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| REX D WINTER<br><br>Plaintiff,<br><br>v.<br><br>THE PNC FINANCIAL SERVICES GROUP, INC.<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.** |

---

**COMPLAINT**

A JURY TRIAL IS REQUESTED

**INTRODUCTION**

1. The Plaintiff is a family man, father of three young children under 6, at least one of whom is at extremely high-risk from COVID-19, and is just trying to survive the COVID-19 pandemic physically and financially. The Defendant is one of the largest banks in the United States of America and has discretionarily decided to close all of the Plaintiff's family's personal and business accounts during the Pandemic, removing Covid-safe access to funds before even notifying the Plaintiff and his family, and is now refusing to provide reasonable modification of their practices to allow COVID-safe access to funds, let alone a recession of their decision to close all of the Plaintiff's accounts until the end of the Pandemic.

**THE PARTIES**

2. The Plaintiff, Rex D Winter is an individual residing at 4713 Dolphin Lane, Alexandria, VA 22309 in Fairfax County with his wife and three young children.

3. Defendant, The PNC Financial Services Group, Inc. is a Pennsylvanian corporation doing

business in the District of Columbia and having a registered office address of: The Tower at PNC Plaza, 300 5th Ave, PITTSBURGH, PA 15222.

## JURISDICTION AND VENUE

4. The Defendant and the Plaintiff are subject to the Jurisdiction of this Court by virtue of the Plaintiff's establishment of accounts at 14th and K St NW Branch, held in DC and under DC Law.

## RESERVATION OF RIGHTS

5. The Plaintiff reserves the right to amend and add allegations, causes of action, and parties to the Complaint.

## STATEMENT OF FACTS

6. The Plaintiff started a banking relationship with the Defendant over thirteen years ago – a period of time representing the majority of the Plaintiff's adult life.

7. The Plaintiff and the Defendant have expanded their relationship over the years to an all-encompassing banking relationship where the Plaintiff now holds five checking accounts, two savings accounts, two minor accounts in trust, a HELOC, personal credit card, business credit card, and business bank account.

8. While the "Account Agreement" between the Plaintiff and the Defendant contains an arbitration provision, the Plaintiff opted out of this agreement both via telephone and certified mail in 2015.

9. Subsequent to the Plaintiff's opt-out, the Plaintiff sued the Defendant in DC Small Claims Court in 2015.

10. The Plaintiff sued the Defendant because of their lack of ordinary care in establishing a requested overdraft on his account, and the Defendant's headquarters failure to correct the

resulting fees on his account to rectify their mistake.

11. The Plaintiff had started a new account with the Defendant and they had neglected to record the overdraft feature on it. Because of the lack of overdraft protection, the Plaintiff incurred two fees which would not have occurred if the overdraft protection were in place.

12. The Plaintiff immediately contacted the Defendant through their branch manager, Steven Knast. The linking issue was solved, but the issue of the fees remained with the headquarters of the Defendants.

13. The Plaintiff requested that both fees be removed, but the Defendant stated they would only remove one overdraft fee – and they would only do that as a courtesy.

14. The Plaintiff pointed out the fees were caused by an acknowledged error on Defendant's part. This was not in question. The Defendant still refused to remove the fee.

15. The Plaintiff escalated the issue to the highest level, but the Defendant largely failed to even return the Plaintiff's calls or respond in any other way.

16. Once in court, the Plaintiff and the Defendant settled the case for $1000.00 and an agreement that the Defendant would listen to the issues surrounding the poor level of support given by their headquarter's office – the Plaintiff provided examples to the Defendant's officer showing their headquarters staffs' lack of knowledge and professionalism, as well as the significant disconnect between the branch and headquarters.

17. The Plaintiff told the Defendant that he was only maintaining his relationship because of the excellent service he received in branch from Hadami Ben Hamouda and Steven Knast.

18. The Defendant was on notice from that initial lawsuit that their customer service was lacking and that there was a significant disconnect between the branch experience and that provided by the Defendant's personnel at their headquarters.

19. The Defendant is aware that their normal customer service, "Normal Client," is inadequate to meet the needs of individuals with more complex banking issues. Because of this, they have established a separate track of service for clients with more involved banking called "Private Client."

20. Despite knowledge of the Plaintiff's issues and the Plaintiff otherwise qualifying, the Defendant did not place the Plaintiff into Private Client for unknown reasons.

21. Throughout the Plaintiff's relationship with the Defendant, the Defendant has consistently urged the Plaintiff to move his accounts to the Defendant and worked to help the Plaintiff expand his personal real estate holdings and generate revenue from them. The Plaintiff relies on the Defendants expertise and advice and the relationship has turned from a simple account / account holder relationship to an all-encompassing relationship in which the Defendant has explicitly stated they are looking out for the Plaintiff and will provide for his and his family's needs. The services and advice provided are commensurate with a Fiduciary relationship.

22. The Defendant financed a portion of all of the Plaintiff's rental properties and still holds two mortgages and a HELOC. During the acquisition process, the Defendant helped the Plaintiff select properties by examining the debt servicing possibilities and viability of the properties to make money in general. The Defendant helped the Plaintiff establish his existing multi-account bank setup and recommended the structure to help manage his personal holdings and accept rent payments.

23. The Defendant helped the Plaintiff establish a checking account to hold funds in trust for his sister – while the Plaintiff originally intended to establish a Trust under Virginia law and an associated bank account for that Trust, the Defendant instead talked the Plaintiff into establishing a checking account in the Plaintiff's name with his disabled sister added to it– stating explicitly

that this would serve the Plaintiff's needs better.  (It did not.)

24. The Defendant told the Plaintiff what to put on disclosure forms for the withdrawal of large amounts of currency and filled out the forms for the Plaintiff.

25. The Defendant listened to the Plaintiff's concerns about finding a good home for his banking during the COVID-19 Pandemic, including, but not limited to, the Plaintiff's need for access to funds for his family and disabled sister, access to government pandemic funding for his family and business, and a stable home for the duration of the Pandemic – the Defendant explicitly told the Plaintiff that they could provide all of that and based on their experience they recommended staying with the Defendant.

26. The Defendant is aware that they hold all of the Plaintiff's family's accounts – they have worked for years to make that happen.

27. The Defendant has stated that they will provide holistic banking services to the Plaintiff, and have regularly met with him to discuss his personal holdings and how they function, found him products to meet his needs, and continually try to find the Plaintiff other banking products and services to help his assets grow.

28. During the COVID-19 Pandemic, the Defendant, through their employee, Hadami Ben Hamouda told the Plaintiff to move his business bank account to the Defendant and specified that the Defendant would give the Plaintiff a good home for his banking throughout the Pandemic and provide assistance with PPP loans and other government programs.

29. During the COVID-19 Pandemic, the Defendant through their employee, Hadami Ben Hamouda, told the Plaintiff to start a checking account with the Defendant to hold funds for his disabled sister – specifying that the Defendant would provide a good home for his banking throughout the Pandemic.

30. During the COVID-19 Pandemic, the Defendant assured the Plaintiff that the Defendant was a good home for his banking and explicitly stated, through the Defendant's employee Hadami Ben Hamouda, that they would serve his banking needs throughout the Pandemic.

31. The Plaintiff relied on the representations made to him and moved his accounts to the Defendant's bank, as well as maintained his existing relationship.

32. The Plaintiff relied on the representation of the Defendant and maintained his family's accounts with the Defendant and filed his 2019 Tax return using the Defendant's account number, knowing it would be linked to any future Government stimulus (filed 10/15/2020).

33. On 12/7/2020, a woman named Ashley called the Plaintiff, stated she was with the Defendant, and that she had questions about his account.

34. To talk with the Plaintiff, Ashley wanted the Plaintiff to provide her with private banking information.

35. The number Ashley called from showed up as a random Michigan number with no caller identification.  The Plaintiff told her he was not comfortable providing private information over the phone to someone who called him unprompted.

36. Ashley asked the Plaintiff why he was withdrawing large amounts of cash, receiving Zelle transfers, and why he received a check for $98,000 from his water company.

37. The Plaintiff, believed it was a fraudulent call and questioned why his bank would even call to request such information, especially as he knew the Defendant was already in possession of the answers.

38. The Plaintiff asked Ashley why she was asking and she said it was to determine if he was in the correct product type.

39. After his call with Ashley, the Plaintiff immediately called his branch and talked to the

Defendant's employee named Rahel.

40. Rahel checked the notes on the Plaintiff's account, placed the Plaintiff on hold, and called Ashley to verify her identity. Rahel returned to the Plaintiff's line and stated Ashley was the Defendant's employee.

41. Given the subject matter and nature of Ashley's questions, the Plaintiff asked Rahel why he was being called and specifically asked "is it anything I need to worry about?" Rahel responded that they were just trying to see if the Plaintiff had the right account and product and not to worry about it.

42. Rahel provided the Plaintiff Ashley's direct number. The Plaintiff called Ashley that day, but she didn't answer and the Plaintiff left it at that. He was happy with the product he was receiving.

43. Over the weekend of 2/19/2021, the Plaintiff began having banking issues. Zelle transfers could not be completed. A credit card declined. Among other issues.

44. On Monday 2/22/2021, the Plaintiff called the Defendant because of the issues he was experiencing. Specifically, the Plaintiff was trying to return a damage deposit to a former tenant via Zelle. The Plaintiff was legally obligated to return the money, but couldn't.

45. For the first ten to twenty minutes of the customer service call, the Defendant's employee told the Plaintiff it was his fault these issues were happening – stating that Plaintiff had forgotten his pin. The Plaintiff assured her that was not it. The Plaintiff tried multiple different pins to no avail. The Defendant then wanted to reset the Plaintiff's pin. The Plaintiff had to argue with the Defendant to ask them to dig into his account instead.

46. Eventually the Defendant found that the Plaintiff's debit cards had been turned off on 2/19/2021. They asked if the Plaintiff had requested that changed. The Plaintiff was

immediately very concerned and stated no. The Defendant stated that there might have been fraud on the account.

47. Finally the Defendant found a letter stating that Plaintiff's account was being closed. The Defendant said not to worry, it was just the Plaintiff's main account and not the others. Later the Defendant said it was all accounts, except the Plaintiff's children's accounts, but that appears incorrect as well.

48. The Plaintiff was absolutely shocked by the news. Who would close a family's bank accounts in the middle of the Pandemic. The Plaintiff asked why his accounts were being closed out of extreme concern over what could be causing this.

49. The Defendant stated they would not tell the Plaintiff why his accounts were being closed and that they had a right to end his account at any time.

50. The lack of timely, complete, and correct information caused a significant amount of distress to the Plaintiff.

51. The Plaintiff was initially unsure if his funds were being held, if he would have any access to them, or really was unsure what was going on at all. This confusion was caused completely by the Defendant's failure to act with ordinary care in communicating with the Plaintiff.

52. The Plaintiff was extremely concerned that fraudulent activity may be occurring on his family's accounts – several of the Defendant's employees theorized that the account issues and debit card shut off could have been fraud related.

53. Despite the Plaintiff's significant concerns about potential fraud on his account, concern stemming from both explicit statements made by the Defendant's employees as well as their conduct, the Defendant failed to meaningfully address or alleviate these concerns, instead,

stating that while they did not know why the accounts were being closed, they were sure it was fine.

54. As the Plaintiff was attempting to decipher the mishmash of information spewing from the Defendant, his wife was placed in COVID isolation during a pre-scheduled doctor's appointment on 2/22/2021.

55. The Plaintiff was home caring for his three young children all alone, his wife was just placed into Covid isolation, and the Plaintiff couldn't even tell his wife if she would be able to pay the copay.

56. As the Plaintiff was caring for his family and trying to figure out how to meet his financial obligations, while having little clue as to what the Defendant was actually doing, the Plaintiff missed a call from Ben Greene, the Defendant's employee.

57. Ben Greene sent a follow up email to his missed call.

58. The Plaintiff replied to Ben Greene's email, explained his wife had just been put into Covid isolation, and literally begged for help with the issue. He received no reply as he struggled alone in tears.

59. The next day, Ben Greene stated he saw the email the previous day and decided not to reply. The Plaintiff admonished Ben and stated his conduct was unreasonable given the situation.

60. On the afternoon of 2/22/2021, the Plaintiff received innocuous single-page letters from the Defendant for each of his accounts. They were mailed via first-class mail. No tracking. No signature requirement. No certification. No stamp indicating that the contents were important or sensitive. Nothing.

61. The letters were dated 2/16/2021, post-marked 2/17/2021, and stated that the Plaintiff's

debit card would be shut down six days from the date of the notice.

62. Instead of waiting six days, the Defendant turned off all the Plaintiff's debit cards just three days later on 2/19/2021, in direct contradiction and breach of their notices.

63. The notices also stated that the Plaintiff's accounts would be closed on 3/13/2021.

64. In discussing the issue with the Defendant, the Plaintiff was told three different dates for account closure: 3/13/2021, 3/15/2021, and 3/16/2021. While also being told that the Defendant has the right to close accounts at any time and for any reason, without any notice.

65. In addition to the above dates, the Plaintiff had a lengthy conversation where the Defendant stated they were going to give the Plaintiff thirty days notice, but the math and statements did not add up – none of the Defendant's conduct or statements did or do.

66. The Plaintiff asked the Defendant why they turned his debit card off before the date indicated on the Notice.  The defendant refused to even acknowledge the question and stated that they would pass on feedback – to be clear, the Plaintiff repeatedly asked why it was turned off early, and the Defendant would not even acknowledge that a question was being asked – and would instead state that it was good feedback and they would pass it on.

67. Because of the lack of explanation regarding the early debit card cut off, the Defendant's claims of an unfettered right to unilaterally close the Plaintiff's accounts in any manner they saw fit, and the Defendant's inability to accurately access and convey information in general, the Plaintiff was under extreme duress due to the uncertainty of what the Defendant would actually do and when.

68. The Plaintiff explained that he needed to send money and that his family was socially isolating because of an extremely high-risk family member.

69. The Defendant stated the only way for the Plaintiff to access his funds was by travelling

physically to his branch office. The only other option was to wait until his accounts were closed and a paper check was mailed to the Plaintiff – an unreasonable alternative that would deprive the Plaintiff of access to his funds for an undetermined amount of time, but likely one month or more.

70. The Plaintiff felt compelled to disclose private medical information because his daughter's life literally hangs in the balance – it caused the Plaintiff distress to have to disclose private medical information about his family to literally beg for help.

71. The Plaintiff explained to the Defendant that his six-year-old daughter had been hospitalized near-death for a breathing condition several times and that his physician had ordered him to avoid the activity the Defendant was requiring.

72. The Plaintiff further explained that his family has been isolating throughout the Pandemic, not working, or attending school, and asked for a reasonable modification of the Defendant's practices and procedures – to simply turn on his debit card and zelle functionality, something that would cause zero hardship for the Defendant.

73. The Plaintiff requested this assistance from everyone he talked to and was eventually forwarded to Ben Greene.

74. Ben Greene stated that he was the sole and highest point of contact for the Plaintiff, that he would be the only person working the issue, and that the issue could not be escalated further.

75. The Defendant refused to provide any reasonable accommodation, refused to turn the Plaintiff's debit card or Zelle functionality back on, and required the Plaintiff to go to the physical branch, all while stating: "I am totally with you on the timing of this, there is definitely a pandemic going on."

76. The Plaintiff was forced to spend several hours physically in his local branch trying to

resolve this issue and conduct his normal banking.

77. The Plaintiff had to hand deliver a cashier's check to a former tenant as the current postal

system is not trustworthy enough for the delivery of important documents like cashier's checks.

78. Part of the reason the Plaintiff had to wait so long in the branch was retrieving a copy of

his account agreement.  The contract governing the relationship between the Plaintiff and the

Defendant.

79. Under the initial account agreement, the Defendant agreed to post PDF copies of the

agreements in the Plaintiff's secure online banking message center and to message him if

changes were made.

80. Even though the account agreement was modified on both 12/13/2020 and 2/28/2021, no

messages or documents are located in the Plaintiff's online messaging system or online

documents system.

81. The Plaintiff receives electronic statements for all concerned accounts.

82. The account agreement states:

"We reserve the right to amend this Agreement (including the right to add new provisions
and to convert your Account from one product to another) and our Consumer Schedule of
Service Charges and Fees (including the right to change charges, fees and the manner in
which we calculate and/or credit interest), from time to time. We will inform you of any
amendment (1) by mailing notice of the amendment and the amendment itself, in paper form,
to the address on file for your statement; or (2) if you have opted to receive online statements
in electronic form, by posting the notice of the amendment and the amendment itself on
PNC's secure Online Banking web site. If you receive statements in paper form, the
amendment will generally appear on your statement. In some cases, notice of the amendment
will appear on the statement and the amendment itself will be included on an insert
accompanying your statement. If you have opted to receive online statements, the
amendment will generally appear as a message on the PDF statement posted on PNC's secure
Online Banking web site as well as in the Messages section of the site. In some cases, the
amendment will be included as a PDF insert on the web site. (For more information about
online amendments and statements, please refer to your Online Banking Service Agreement.)
When the amendment becomes effective, we will post the new version of this Agreement
online and make the new version available in our branches. An amendment will become
effective 30 days (or such later time if required by law) after notice of the amendment is

> delivered or otherwise made available to you, unless a shorter time period is permitted by applicable law or required because of an emergency situation, in which case we will provide notice as we deem practicable.

83. The Plaintiff called his branch and requested a copy of his account agreement and requested they have it ready when he arrived to minimize his exposure.

84. When the Plaintiff arrived, the branch had printed a fees and disclosure statement several times, but not the account agreement. The employees did not even know that there was an account agreement or what it was, let alone how to access it.

85. Eventually, after a half hour, a banker was able to find the 12/13/2020 version of the account agreement and print it.

86. The Plaintiff's local branch was unaware that the Plaintiff's accounts were being closed and were very apologetic and could not believe this was happening to the Plaintiff.

87. The Plaintiff requested a copy of the historical changes to the agreement as they were not mailed to him or available online, as required by the account agreement.

88. The issue was escalated from the branch to the Defendant's headquarters as branch personnel could not find any of the documents online or in their system – anywhere.

89. On 3/9/2021, the Plaintiff received another copy of a fees schedule. No account agreement. It was dated 2/26/2021 and mailed via USPS from the Defendant's headquarters, but was delivered to the Plaintiff's neighbor.

90. Even though the Plaintiff requested the current account Agreement from several of the Defendant's employees, most did not even know what an account agreement was, and not one single person provided a copy of the current 2/28/2021 account agreement. The Plaintiff found it through a google search.

91. While failing to properly provide notice of modifications to the account agreement, the

Defendant used their unilateral discretion to make the following changes, among others:

a. Changed the provision allowing closure of accounts so that they no longer have to give their clients notice prior to closing the account

b. Changed the rules so that notices sent from the Plaintiff are only effective after the Defendant actually receives them and has a reasonable time to act on them. The Defendant's notices are effective as of the date they are placed in the hands of USPS. The Defendant stuck with this change in both application and in the 12/13/2020 and 2/28/2021 versions of the account agreement, despite their knowledge of the ongoing issues affecting the USPS. It is worth noting that this does not affect the Defendant's rights, since actual receipt is required for notice to be effective on the Defendant.

92. The USPS is not functioning properly. It has been the subject of congressional hearings, presidential scandal, and international intrigue. The Defendant is well aware of the issues with USPS, but continues to irrationally rely on the USPS despite this knowledge.

93. On at least two separate phone calls, the Defendant's employees, unprompted, referenced the Defendant's knowledge of the issues plaguing the USPS system.

94. The Defendant eventually offered to send the Plaintiff a new debit card. However, the Defendant would not turn on Zelle transfer functionality, which is linked to the card, so it will not allow Covid safe payments and is therefore of little use to the Plaintiff.

95. When mailing the debit card, the Defendant stated there were issues with USPS and that they would mail it overnight via Fedex to make sure it actually arrived and arrived on time.

96. The Plaintiff was extremely upset that the Defendant knew of the issues with USPS and still entrusted the closure of his family's financial future to a simple first class letter and no other

notification method – all while happily Fed Ex'ing a debit card. It is such an egregious disparity in treatment that it appears punitive in nature.

97. After a thirteen-year plus all-encompassing-relationship involving all of the Plaintiff's family's money, literally all of the Plaintiff's financial future and security, in the middle of the COVID-19 Pandemic, and the Defendant could not send an additional Notice via Fedex or reach out through Branch personnel. The Plaintiff could not believe the conduct of the Defendant.

98. As the Plaintiff navigated the varying layers of bureaucracy at Defendant's headquarters, he became increasingly frustrated at the incorrect information, misinformation and complete lack of compassion he was receiving. As a result, he created a website titled www.suepncbank.com to convey to the Defendant the outrageous nature of their conduct.

99. The Plaintiff sent a link to the website to the Defendant, but the Defendant still refused to respond in any meaningful manner.

100.     The Plaintiff also express-overnighted a cease and desist letter to the Defendant explaining the situation and asking for help. It arrived on 3/2/21. The Defendant acknowledges receipt and says they are working on a response, but the Plaintiff has not received it, despite asking that it be expedited since this is greatly affecting his family and personal well-being. The Plaintiff also provided explanations for his account activity in the letter. An electronic courtesy copy of the letter was also emailed to the Defendant on 3/1/21.

101.     Had the Plaintiff been aware of the true nature of the Defendant's investigation into his account, the Plaintiff would have provided the information requested by Ashley.

102.     The Plaintiff relied on statements made by Rahel and Ashley and believed that the investigation was a sales call trying to sell the Plaintiff different banking products, as the Defendant regularly tried to meet with the Plaintiff and sell him products.

103.    For example, the Plaintiff had recently told the Defendant that he would not meet with the Defendant's wealth banker again until at least the spring, specifying that the Plaintiff and his family were isolating because of the Pandemic and risks associated with a high risk family member.

104.    In addition, all of the information requested by the Defendant was already in the Defendant's possession.  As part of his regular banking relationship, the Plaintiff regularly told the Defendant's branch employees about his activities and income.  It was a symbiotic and all-encompassing relationship where they found things to help the Plaintiff and the Plaintiff relied on their banking expertise and advice for his investments and beyond.

105.    The Plaintiff specifically provided information about Zelle, Cash app, Venmo payments, and the legal settlement from his water company to both Hadami Ben Hamouda and Steven Knast, the Defendant's employees.

106.    The Defendant is and was aware at all levels of what they are doing to the Plaintiff's family during the pandemic and have still failed to respond in any meaningful way – they just don't care.  But why is this happening?

107.    After a decade long mutually-beneficial all-encompassing relationship, the Defendant decided to abandon the Plaintiff's family in the middle of the pandemic and their official explanation is: we will not tell you why, only that "we decided to end the relationship, just as you have a right to as well … we have a right and we do take advantage of that."

108.    Well, the Plaintiff certainly feels taken advantage of, that is for sure.

109.    Luckily, even though the Defendant itself refused to provide the rationale, two of the Defendant's employees have stated that it was because of zelle transfers – the information Ashley asked about.

110. The Defendant's employee, Ben Greene, stated "What they did advise is they did reach out for an explanation of some activity and …were unable to gain an understanding so we decided to end the relationship."

111. The Plaintiff asked the Defendant to please keep his accounts open so that he can receive stimulus payments from the American Rescue Plan and others, explaining that his checking account is linked to the Plaintiff's taxes.

112. In response to the Plaintiff's request, the Defendant's employee erroneously stated that once the bank refused the payment, the IRS would forward a paper check of any stimulus payments directly to the Plaintiff (effectively providing incorrect financial advice to the Plaintiff).

113. The IRS does not in fact forward stimulus payments. If you change banks, you have to wait for your tax return to receive the payments.

114. Stimulus payments are one of the main ways of combatting the economic effects of the Pandemic – a fact the Defendant is or should be aware of – and they are linked to individual's bank accounts.

115. Discretionarily closing bank accounts at this time goes against public interest.

116. Forcing individuals to do in-person banking goes against public interest and guidelines established at all levels of government – including FDIC guidance for banks – this is because the increased personal interaction creates additional risk of COVID transmission.

117. On 3/3/2021, the Plaintiff emailed the Defendant's employee, Ben Greene, the individual who stated he was the sole point of contact and would be working the issue for the Plaintiff, and again asked him about turning the Plaintiff's debit card back on.

118. On 3/5/2021, the Defendant's employee, Ben Greene called the Plaintiff and

stated he was no longer working on the case and that he had closed it and only called back as a courtesy – this came as a shock to the Plaintiff who thought Ben Greene was working behind the scenes to help with his family's issues.

119.     The Defendant has now stated they will keep one of the Plaintiff's family accounts open an additional 30 days, but they will not allow Zelle functionality. Because the Defendant is closing all of the Plaintiff's other accounts – the exact accounts the Defendant had earlier encouraged the Plaintiff to establish linking to – the limitations effectively prevent the Plaintiff from banking despite the 30-day extension.

120.     In addition to extreme emotional distress, the Plaintiff has experienced financial loss and physical manifestations of his emotional distress.

121.     The Plaintiff's tenants have become aware of the Plaintiff's bank account closure, as The Plaintiff was unable to send funds.  This caused the Plaintiff emotional distress as it paints him in an unfavorable light, and unreasonably so.

122.     On 2/25/2021, the Plaintiff had an emergency medical appointment with his doctor to obtain treatment for his extreme emotional distress and the accompanying phsycial maifestations.

123.     As a result of the medical appointment, the Plaintiff was placed on medication and counselling as a direct result of this incident.

124.     The Plaintiff's doctor stated that the physical symptoms the Plaintiff was experiencing were physical manifestations of his emotional distress.

125.     In this brief, it is impossible to convey how much torment the Defendant put the Plaintiff and his my family through.  The Defendant holds all of the money that keeps the Plaintiff's family alive and safe.  The Defendant controls almost everything.  The balance of

equities between the Plaintiff and the Defendant approaches David vs Goliath.

126.     The Plaintiff lost 12.8 pounds in the first four days, 24.3 pounds over 19 days, was not able to sleep, and experienced extremely high anxiety, irritability, high blood pressure (30 points above normal), heart palpitations, and stomach issues, among other symptoms.

127.     The Plaintiff was forced to pull a $150,000 line of credit held by the Defendant, because the Plaintiff will need it in the future, cannot obtain another HELOC elsewhere because of the Pandemic and its financial repercussions, and he could not reasonably rely on it being available because of the conduct of the Defendant.  The Plaintiff is now paying interest for that money to sit.

128.     The Plaintiff paid for gas and a vehicle to travel to the branch and subsequently drive a cashier's check to his former tenant.  If the Defendant had turned off the debit card / Zelle when they said they would, or not at all, this would not have been necessary.

129.     Instead of focusing on PPP funding for his business and the expiration of the CARES act Forbearance, the Plaintiff has had to dedicate large amounts of time and attention to this matter during the Pandemic.  This is all reasonably foreseeable.  The Defendant simply does not care about the effect on the Plaintiff and has failed to take it into account in any way.

130.     The inability to physically access other banks and branches significantly limits options and increases the difficulty and repercussions of banking decisions.  The pandemic is not a good time to be moving to another bank, the Defendant knows or should know this as they are one of the largest banks in the country.

131.     In addition to being morally unconscionable, what the Defendant is doing goes against usual and prudent business and banking practices.

132.     The Plaintiff is a licensed attorney (albeit non-practicing, other than pro-bono

work), maintains account balances at high levels, has the highest tier credit score, and has over thirteen years of exemplary repayment history with the Defendant across multiple mortgages, checking accounts, savings accounts, personal credit cards, business checking, business credit card and HELOC.

133. The Plaintiff has never knowingly failed to meet a requirement of the account agreement and has both paid for and met all of his account obligations with the Defendant for the last decade.

134. The Defendant recruited the Plaintiff to bring his and his family's banking to the Defendant because he is a good client.

135. Even after deciding to close the Plaintiff's accounts, the Defendant still recognized the Plaintiff's value as a client. On 2/25/21, the Defendant enrolled the Plaintiff in "Private Client", stating "With the Private Client … we recognize you as something we want to build a better relationship with …"

136. The individual processing the Private Client enrollment stated he was shocked that the Plaintiff had not been enrolled sooner.

137. Inclusion within Private Client would have assigned a personal banker with a high level of experience to the Plaintiff. That banker would have multiple ways to reach the Plaintiff and vice-versa.

138. Inclusion within Private Client would have prevented the communication issues that caused this issue.

139. The Plaintiff asked Private Client banker, Michael Fabian, whether Private Client was established to: "give higher net worth clients that have more sophisticated banking issues a single point of contact instead of the normal PNC people who can be kind of frustrating in their

lack of knowledge" and he stated: "you hit it right on the head."

140. The Plaintiff has asked why he was not offered Private Client access earlier, but has received no response why he was left as a Normal Client, especially when the Defendant knew or should have known that Normal Client service is inadequate to meet the needs of clients such as the Plaintiff.

141. On the first phone call with his Private Client banker, the Plaintiff explained the situation and asked for help – he was dismissed from Private Client on the call.

142. The effects of the Defendant's conduct on the Plaintiff's family cannot be understated; the same as the Plaintiff's money always provides security and stability to his family, the uncertainty surrounding its availability and the ability to use it in a COVID-safe manner is also all-encompassing – a constant threat to Plaintiff and Plaintiff's family's well-being. Family events and COVID-safe outings were cancelled or tarnished with calls to representative of other banks, or to the Defendant, among other things. This has been a life altering event, it is not a small or trivial issue.

143. The Plaintiff has had to forgo working on his struggling business, affecting the lives of everyone working for or with the Plaintiff. This has affected PPP funding and has cost the Plaintiff a significant amount of money in fact and in opportunity costs.

144. The Plaintiff's entire family was affected in this way. Shame on you, PNC.

**FIRST CAUSE OF ACTION**
**Breach of Contract – Failure to Notify Regarding Amendments**

145. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-144 and 152-244 of this Complaint.

146. The account agreement between the Plaintiff and the Defendant allows the Defendant to unilaterally modify the agreement. The Defendant has all of the power to dictate

changes. It is not a two-sided arrangement.

147. The account agreement requires the Defendant to notify the Plaintiff when changes are made to the account agreement and to make them available for the Plaintiff in specific ways.

148. The Defendant has failed to notify the Plaintiff of changes to the account agreement in the manner and method proscribed by the account agreement by failing to post the changes in the online messages system.

149. The Defendant has failed to notify and provide the Plaintiff with a copy of the current account agreement and historical changes, even when specifically requested from multiple of the Defendant's employees.

150. The Plaintiff has suffered damages because of the changes included within the account agreements that he did not receive – including extreme emotional distress and financial repercussions.

151. If the Plaintiff had received notice of the unilateral changes made by the Defendant in his online message system, changes that greatly affect the Plaintiff's rights, he could have acted to mitigate the foreseeable results of the changes by moving banks or creating another banking relationships.

**SECOND CAUSE OF ACTION**
**Breach of Contract – Failure to Abide by Debit Card Notice**

152. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-151 and 157-244 of this Complaint.

153. The Defendant specifically provided notice to the Plaintiff stating they would turn off his Debit card six days after 2/16/2021.

154. The Defendant turned off the Plaintiff's access to his debit card on 2/19/2021, just

three days later, and before the Plaintiff had even received notice.

155. Because of the breach of their specific notice, the Plaintiff suffered actual and emotional harm, including, but not limited to, emotional distress, having to travel to the physical bank branch, having to hand deliver a Cashier's check, and being unable to access funds in a COVID safe manner.

156. The uncertainty of the Defendant's future conduct exacerbated the extreme emotional distress caused by the Defendant and was the proximate cause, this is a reasonably foreseeable result of the Defendant's choice to turn off the Debit Card early, without notice or explanation.

**THIRD CAUSE OF ACTION**
**Breach of Contract – Breach of Implied Duty of Good Faith and Fair Dealing (CL)**

157. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-156 and 166-244 of this Complaint.

158. In closing the Plaintiff's family's accounts, the Defendant was Arbitrary and Capricious.

a. The Defendant failed to use reasonable diligence to determine facts necessary to its decision to close the Plaintiff's family's accounts – their investigation of the accounts was conducted via distant phone call without even caller ID – no letters were sent or received and no effort was made to reach out through the Plaintiff's relationship with his branch, despite this being the specific issue identified in a settlement between the Plaintiff and the Defendant a few years earlier.

b. The Defendant failed to give proper consideration to facts relevant to the decision to close the Plaintiff's family's accounts, including, but not limited to, the COVID-19 Pandemic raging across the entire world, FDIC guidance, CDC

guidance, District of Columbia guidance and public policy and Federal guidance and public policy.

      i.  For example, this occurred while the DC Government was essentially closed for in person business and while evictions were banned for any reason — not just evictions for non-payment, because those people may have nowhere else to go; but also evictions for nuisance tenants who have paid in full, because it is unconscionable to unnecessarily expose people to personal interactions and the additional exposure to COVID-19. These protections were in place for people who were at fault and able to afford to move. The DC Government Order, CDC order, and the many others that have been adopted across the country, are both for the individual's safety and the greater public interest.

  c.  The Defendant based its action on conclusions reasonable people would not reach on the same facts. Even the Defendant's employees could not believe the timing and conduct of their employer – many offering sympathy and shock, but not meaningful solutions, as those were withheld by the Defendant's headquarters for unknown reasons.

159.    The Defendants were Dishonest in their statements about the investigation into the Plaintiff's accounts. If they had told the Plaintiff the real reason for the inquiries or about the potential repercussions, the Plaintiff would have provided the information they requested – this is known for certain, since the Plaintiff had previously provided the information to the Defendant.

160.    By closing the Plaintiff's accounts during the Pandemic, the Defendant is evading the spirit of the account agreement and banking relationship in general – specific promises of

service were made and they are not being met – over and above the question of the Plaintiff's

specific circumstances not being taken into account, there is an absolute refusal on the part of the

Defendant to consider any repercussions of their actions in the face of the global pandemic that is

affecting every American.

161.     The Defendant has shown an extreme lack of diligence and slacking off in

investigating the Plaintiff's account and has willfully rendered imperfect performance since their

decision, by refusing to provide current copies of the account agreement and other services.  This

has been done either willfully, or with such a reckless disregard for their actions that it amounts

to willful conduct.

162.     While failing to provide notice of changes to the account agreement or even

provide copies of the account agreement when specifically requested, the Defendant has abused

their power to modify terms in the account agreement in ways that unfairly represent the

Defendant's interest to the detriment of the Plaintiff.

163.     In addition to the above, the Defendant interfered with the Plaintiff's performance

of his part of the contract because of incorrect statements about the investigation into the

Plaintiff's accounts.  But for their misrepresentations and/or omissions, the Plaintiff would have

provided all information.

164.     The Defendant's conduct was the sole and proximate cause of the Plaintiff's

severe emotional distress.

165.     The Plaintiff has suffered extreme emotional distress because of the Defendant's

breach.  In addition, the plaintiff has suffered financial harm and easily foreseeable physical

manifestations.

**FOURTH CAUSE OF ACTION**
**Breach of Contract – Breach of Implied Duty of Good Faith and Fair Dealing (UCC)**

166.     The Plaintiff restates as if herein set forth in full all of the allegations in
Paragraphs 1-165 and 173-244 of this Complaint.

167.     Article 4 of the UCC covers depository banks, such as the Defendant and subjects
them to an implied duty of good faith and fair dealing as well as requiring them to operate with
ordinary care.

168.     The Defendant breached their duty of good faith and fair dealing in many ways,
including, but not limited to discretionarily closing the Plaintiff and the Plaintiff's family's
accounts in the middle of the Pandemic when they knew or should have known the effects it
would have on the Plaintiff and the Plaintiff's family.

169.     When the Defendant has discretion to perform an act under an agreement, it is
obligated to exercise its discretion in an honest and reasonable way.  Here the Defendant has
omitted facts and made explicit statements to the Plaintiff, both in writing and orally, which were
untruthful.

170.     The Defendant has failed to reasonably investigate the issue surrounding the
Plaintiff's accounts and because of their representations to the Plaintiff that the Defendant's
inquiry was not important and nothing to worry about, as well as their failure to contact the
Plaintiff in any way other than an unsolicited phone calls requesting private banking information,
the Defendant precluded the Plaintiff from meaningfully responding – even though the
Defendant was already in possession of the answers it sought.

171.     The implied covenant exists for the purpose of inferring equitable contractual
terms when new developments arise that neither party anticipated.  Here, neither party
anticipated a global pandemic, required access to remote transfer methods, or any of this.  It
would be unconscionable to allow the Defendants to deprive the Plaintiff and his family of the

fruits of their agreement at this time. The Defendants actions are not in line with the reasonable intentions and expectations of the parties at the time the contract was formed because this special situation was unforeseeable.

172. The Defendants conduct is the sole and proximate cause for the easily foreseeable harms the Plaintiff and his family have suffered.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentations**

173. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-172 and 182-244 of this Complaint.

174. The Defendant explicitly stated they would be the Plaintiff's home during the Pandemic – this statement was false as just months later the Defendant moved to end the decade long relationship for all of the Plaintiff's accounts.

175. The Defendant explicitly stated they would provide a good home for the Plaintiff's disabled sister's account and this statement was false, as just months later the Defendant moved to close the account.

176. The Defendant explicitly stated they would provide a home for the Plaintiff's business account and would assist him with PPP loans and other government programs as needed.

177. The misrepresented facts pertain to the most material of issues for the Plaintiff's family – the closure of his family's carefully constructed banking accounts and linked payments.

178. In making these affirmative representations to the Plaintiff, the Defendant intended to induce the Plaintiff into moving, starting, and maintaining accounts with the Defendant – all to the Plaintiff and the Plaintiff's family's eventual detriment.

179. The Plaintiff relied on the false statements made to him by the Defendant when

deciding to maintain his banking with the Defendant, utilizing his checking account with the Defendant for his 2019 tax return (filed 10/15/2020), and in bringing his disabled sister's banking to the Defendant.

180. The Plaintiff reasonably relied on the banking expertise and advice of the Defendant's employee and has suffered as a result.

181. The Defendants conduct was the sole and proximate cause of the Plaintiff's severe emotional distress and additional injuries.

**SIXTH CAUSE OF ACTION**
**DC Consumer Protection Procedures Act**

182. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-181 and 188-244 of this Complaint.

183. The CPPA prohibits the Defendant from representing that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; here the Defendant made specific promises that the Defendant would be the Plaintiff's home throughout the Pandemic

184. The CPPA also prohibits the Defendant from misrepresenting a material fact which has a tendency to mislead; here, including, but not being limited to, the Plaintiff was misled that his accounts would be held open throughout the Pandemic and that the Defendant would look out for the Plaintiff and the Plaintiff's family's best interest.

185. In addition, the Defendant has failed to supply the Plaintiff with a copy of the current service contract even though it was specifically requested (account agreement).

186. The Defendant has used their position of power to make and enforce unconscionable terms and provisions in the account agreement; including, but not limited to changing notice provisions so that notice is affective on the Plaintiff when posted in the USPS,

but requiring actual receipt AND a reasonable amount of time to act on the notice in order for service to be affective on the Defendant.

187. The Defendants conduct was the sole and proximate cause of the Plaintiff's severe emotional distress and financial injuries, they are a direct and foreseeable result of the Plaintiff's conduct.

**SEVENTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**

188. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-187 and 194-244 of this Complaint.

189. The Defendant has acted in an extreme and outrageous manner in deciding to close the Plaintiff's and the Plaintiff's family's accounts in the middle of the Pandemic while having been made aware of the Plaintiff's family's health issues. In addition, the manner in which the Defendant has conducted itself after deciding to close the Plaintiff's accounts has itself been extreme and outrageous.

190. The Defendants conduct is beyond reckless and has failed to take into account the repercussions on the Plaintiff and his family in any way.

191. The Defendant's conduct has caused the Plaintiff extreme emotional suffering – so much so that the Plaintiff has required medication and treatment for the physical manifestations.

192. The Defendants conduct was the sole and proximate cause of the Plaintiff's severe emotional distress.

193. The effects of the Defendants conduct on the Plaintiff's family cannot be understated; the same as the Plaintiff's money always provides security and stability to his family, the uncertainty surrounding its availability and the ability to use it in a COVID-safe

manner is also all-encompassing.

**EIGTH CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**

194. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-193 and 200-244 of this Complaint.

195. The Defendant acted with a willful disregard for the health, safety, and welfare of the Plaintiff in forcing the Plaintiff to physically go to their branch during the Pandemic, into the zone of danger, despite being on notice of the Plaintiff's medical restrictions and the COVID-19 Pandemic raging around us.

196. The Plaintiff was placed at immediate risk of physical injury, specifically, contracting COVID-19, and feared for his own safety and that of his family throughout the ordeal.

197. The Plaintiff was placed in extreme emotional distress by the conduct of the Defendant and has experienced objective manifestations of that genuine and severe emotional distress; to include, but not be limited to, the Plaintiff lost 12.8 pounds in four days, 24.3 pounds over 19 days, was not able to sleep, and experienced extremely high anxiety, irritability, high blood pressure, heart palpitations, and stomach issues, among other symptoms.

198. The Defendant's conduct was the sole and proximate cause of the Plaintiff's severe emotional distress and physical manifestations.

199. The Plaintiff's physician stated that the symptoms the Plaintiff was experiencing are a direct result of the Plaintiff's emotional distress and are physical manifestations of such. As such, the Plaintiff's physician prescribed medication and therapy to treat the Plaintiff. (medical records will be provided).

**NINTH CAUSE OF ACTION**

**Breach of Fiduciary Duty**

200. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-199 and 211-244 of this Complaint.

201. While a bank normally owes no Fiduciary Duty to its account holder, and admittedly one is not found in the account agreement between the Plaintiff and the Defendant, a special relationship has been implied from the surrounding facts and the relationship of the parties.

202. Prior to the Pandemic, the Defendant acted in a manner more akin to a fiduciary than a normal banking relationship. They told the Plaintiff to bring all of his business and accounts to the Defendant and promised to take care of him. Among other things, the Defendant financed almost all of the Plaintiff's property acquisitions, to one extent or another, assisted with the selection of the properties by ensuring they were a good investment that would provide a decent return, told the Plaintiff how to establish his account structure and billing to best take care of his properties, provided advice regarding the preparation of forms and completed them on behalf of the Plaintiff, and explicitly stated that they were operating with the Plaintiff's best interest in mind and trying to find him products to support him and grow his business.

203. After the Pandemic began, the Fiduciary role of the Defendant expanded as the Plaintiff came under a disability and disadvantage in the relationship due to medical restrictions, general movement restrictions, and the unprecedented general shut down of large portions of the United States economy, among other things.

204. During the Pandemic, the Plaintiff experienced issues sourcing government grants and relief intended to help struggling businesses and individuals during the Covid-19 Pandemic. Additionally, the Plaintiff took on a responsibility to care for his disabled sister's funds.

205.    Because of the issues he had experienced and the concerns it raised, the Plaintiff reached out to the Defendant through their employee Hadhami Ben Hamouda for advice and solutions to his issues.

206.    The Defendant explicitly told the Plaintiff that they would be his banking home throughout the Pandemic, both in relation to starting a new business account and business credit card, establishing an account in Trust for his disabled sister, and the maintenance of his family's existing accounts.

207.    In establishing the new account for his sister, the Plaintiff planned to draft a trust under Virginia law and start an account for that trust.

208.    When the Plaintiff asked the Defendant if they would notarize the trust he was establishing, the Defendant told the Plaintiff that he would be better served by starting an account in his own name and adding his sister to it. The Plaintiff relied on the advice of the Defendant to his detriment.

209.    The Defendant has abandoned the Plaintiff and his family in the middle of the Pandemic for discretionary reasons and with little to no thought of the repercussions on the Plaintiff or his family. Even when confronted with this, and requests for reasonable accommodation, the Defendant continued with its course of action to the detriment of the Plaintiff. The Defendant has a duty to the Plaintiff to deal fairly, honestly, and openly, instead they have breached that and other fiduciary duties through their actions.

210.    The Plaintiff has suffered both financial harm, extreme emotional distress, and physical manifestations of his extreme duress. The Defendant's conduct is the sole and proximate cause of the Plaintiff's injuries.

**TENTH CAUSE OF ACTION**
**Willful and Wanton Conduct**

211. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-210 and 217-244 of this Complaint.

212. In addition to the Fiduciary Duty previously identified, the Defendant owes the Plaintiff a standard duty of ordinary care in all of their actions and communications.

213. The Defendant has breached its duty of ordinary care in numerous and significant ways, primarily by giving the Plaintiff an intractable catch-22 situation: namely, the Defendant turned off COVID safe access to funds in contradiction of its own written notice, then forced the Plaintiff to decide between failing to meet a legal requirement for returning a damage deposit, or entering the Defendant's branch and exposing himself to COVID-19. The Defendant made these decisions willfully and with full knowledge of the situation and repercussions for the Plaintiff and his family.

214. The Defendant's conduct, has either been intentional or committed under circumstances exhibiting a reckless disregard for the safety of the Plaintiff and his family. The Defendant informed the Defendant of his disability prior to their discretionary decision to close his family's account, in addition, the Defendant is well aware of the Pandemic, and existing medical and policy guidance from the DC Government, CDC and other portions of the Federal government – all of which goes directly against the Defendant's discretionary decision to close the Plaintiff's accounts and force in-person interactions, even in the face of disclosed COVID isolation.

215. The Defendant has failed to act as a reasonable person would under similar circumstances and has acted instead with a complete and utter disregard, not just for the Plaintiff and his family, but also towards the District of Columbia and the United States of America in general. The Defendants failure to modify its determination or provide COVID safe access even

after receiving full knowledge of the impending danger and repercussions for the Plaintiff and his family, further identifies the extreme nature of the Defendant's conduct.

216. In arguendo, even if each act of the Defendant fails to reach the standard of reckless conduct necessary for Willful and Wanton conduct, when combined, the Defendants multiple actions constitute a willful and reckless disregard for the Plaintiff and his family in breach of the duty of ordinary care.

**ELEVENTH CAUSE OF ACTION**
**Gross Negligence**

217. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-217 and 219-244 of this Complaint.

218. The Plaintiff restates herein the above claims for Willful and Wanton conduct as a Gross Negligence claim.

**TWELVTH CAUSE OF ACTION**
**Negligence**

219. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-218 and 221-244 of this Complaint.

220. The Plaintiff restates herein the above claims for Willful and Wanton conduct and Gross Negligence as a simple Negligence claim.

**THIRTEENTH CAUSE OF ACTION**
**Americans with Disabilities Act – Title III**

221. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-220 and 228-244 of this Complaint.

222. Under the ADA's Title III, banks must give equal treatment to all customers, with and without disabilities. Section 508 extends the ADA from physical locations to also include digital platforms.

223.    Additionally, the ADA's Title III requires the Defendant to provide "reasonable modifications" of policies, practices and procedures, or "auxiliary aids and services," where necessary to provide equal access to their services for persons with disabilities

224.    The Plaintiff and the Plaintiff's family have a disability – namely an unknown breathing condition that affects the Plaintiff's family and has hospitalized his 6 year old daughter near death several times. This physical or mental condition substantially limits a bevy of major life activities – most notably, breathing. This is not a transitory issue, nor minor. It is an ongoing issue that is exacerbated by the Pandemic and results in near-term death if appropriate medical care is not received. The Plaintiff's doctors have cautioned that the condition, when combined with COVID, will most likely be fatal even with medical treatment.

225.    This physicians responsible for treating the Plaintiff's family have provided medical guidance which precludes the Plaintiff from engaging in the conduct required by the Defendant.

226.    Both prior to the Defendant's decision to close the Plaintiff's accounts and after, the Plaintiff informed the Defendant of his family's disability and requested reasonable modification of their policies and practices so that he and his family could access their funds.

227.    In arguendo, the Plaintiff's disability is a mental condition that precludes him from accessing situations where he may contract COVID-19 or any other illness. This is not a transient or minor condition. It has been present for over four years and the symptoms are significant. When exposed to situations where he could contract COVID-19 or other illnesses, the Plaintiff suffers mental anguish which substantially impairs his ability to care for himself, eat, sleep, concentrate, think, or work. While exacerbated by the COVID-19 Pandemic, especially now that hyper-transmissible variants have arrived in the DC area, the condition is not

COVID specific and is rather tied to knowledge that his daughter is likely to die if the Plaintiff contracts a serious illness and passes it to her.

**FOURTEENTH CAUSE OF ACTION**
**District of Columbia Human Rights Act**

228. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-227 and 238-244 of this Complaint.

229. The DC Human Rights Act prohibits the Defendant from denying, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation based on familial responsibilities, disability, or source of income.

230. The Defendants have failed to provide meaningful accommodation to the Plaintiff after he disclosed his Disability and the medically mandated restrictions placed on his life as a result.

231. The Plaintiff simply requested that his debit card and Zelle transfer functionality be turned back on, so that the Plaintiff could conduct his banking in accordance with his medical restrictions and send money remotely.

232. The Defendant failed to act on the Plaintiff's request in a timely manner and instead stated the Plaintiff's only option to access his funds was to physically enter the bank.

233. The Defendant eventually provided the Plaintiff a debit card, but no Zelle transfer functionality. The Defendant stated they were unable to turn the Zelle functionality back on. When the Plaintiff asked if they were unable to or if they were choosing not to, the Defendant refused to answer the question.

234. The failure of the Defendant to provide meaningful accommodation for the Plaintiff's disability has resulted in significant harm to the Plaintiff and the Plaintiff's family.

235. The Defendant provided advice to the Plaintiff in establishing a checking account to hold funds in trust for his Disabled sister. In doing so, the Defendant steered the Plaintiff into an account type which disadvantaged his sister and has prevented her from utilizing the Defendant's services. But for the Defendant's actions, the Plaintiff's disabled sister would still have a bank account.

236. The Defendant's violation of the DC Human Rights Act has caused the Plaintiff easily foreseeable injuries, the sole and proximate cause of these financial losses and extreme emotional distress / physical manifestations is the Defendant's conduct.

237. The Defendant's violation of the DC Human Rights Act has directly and indirectly denied the Plaintiff, the Plaintiff's family, and the Plaintiff's disabled sister access to the full and equal enjoyment of the Defendant's services – namely, the ability to access and transfer funds to others, among others.

**PRELIMINARY INJUNCTION / TRO**

238. The Plaintiff restates as if herein set forth in full all of the allegations in Paragraphs 1-237 of this Complaint.

239. For the reasons previously stated, the Plaintiff respectfully submits that he and his family are likely to succeed on the merits of his claims reference above;

240. If the Defendant is allowed to close the Plaintiff's family accounts, it is a bell that cannot be un-rung. Any payments from the CARES Act, American Rescue Plan, or similar programs or payments, will not arrive when intended. The receipt of those funds later down the road, or money damages later after a lawsuit, will not prevent the Plaintiff from suffering irreparable harm now because the Plaintiff will be deprived of access to said funds when they are needed most, and when they were intended to be received. This will deprive both the Plaintiff's

family, and the economy in general, of the relief intended to alleviate harm from the Pandemic.

241.     The balance of equities between the Plaintiff and the Defendant is David versus Goliath.  These are not equal parties.  The Defendant has almost all of the power in the relationship and has used it to dictate unfair terms, among other things.  The Defendant is a multi-billion dollar banking enterprise, one of the largest in our country, the Plaintiff is a Dad with three kids under six who just wants his family to survive the Pandemic physically and financially.

242.     As alluded to above, the injunction is in the public interest.  Without a continuity in banking, a large portion of the efforts of the DC and Federal government to alleviate the effects of the Pandemic will be undone.  In addition, continuity in banking is necessary to access funds in a COVID-safe manner.  It is in the public interest to keep those transfer options open and accessible to ensure Americans so they have safe access to their funds while quarantined or otherwise affected by COVID. The discretionary closure of accounts goes directly against this public interest.

243.     The Plaintiff request that this court preliminary enjoin the Defendant from closing any of the Plaintiff's bank accounts, his family's bank accounts, and/or his business accounts.

244.     The Plaintiff also requests that the Court preliminarily enjoin the Defendant from discretionarily closing retail banking checking and savings accounts of other similarly affected individuals with US Based accounts that are being closed solely because of the Defendant's discretion and not an objective standard that has been triggered.

**PRAYER FOR RELIEF**

Please grant Judgment against the Defendant and in the Plaintiffs' favor and grant the following relief:

A. Compensatory damages to cover medical bills, treatment, and all actual costs, the total of which is currently unknown, but will exceed $25,000.

B. Emotional Damages

C. Punitive damages

D. Treble Damages

E. Attorney's fees

F. Court Costs

G. All other relief as the Court deems just and proper.

Dated: 3/12/2021

Respectfully Submitted,

Rex D Winter

By: ______________/S/________________

Rex D Winter
4713 Dolphin Lane
Alexandria, VA 22309
(202) 341-9453
Rex.D.Winter@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true, accurate and complete copy of this will be mailed, U.S. postage prepaid, this 13th day of March, 2021, to the Defendant's registered office:

The PNC Financial Services Group, Inc
PNC Bank, N.A.
The Tower at PNC Plaza
300 Fifth Avenue
Pittsburgh, PA 15222

Dated: 3/12/2021

By: ___________/S/___________________
Rex D Winter

Rex Winter
4713 D
Alexa

7020 2450 0000 1660 1336

UNITED STATES POSTAL SERVICE
1000
15222
U.S. POSTAGE PAID
FCM LG ENV
MOUNT VERNON, VA
22121
MAR 13, 21
AMOUNT
$9.05
R2304E107075-03

Received
MAR 16 2021
Legal Department
Pittsburgh, PA

RETURN RECEIPT REQUESTED

The PNC Financial Services Group, Inc.
The Tower at PNC Plaza
300 5th Avenue
Pittsburgh, PA 15222

